This Opinion is a
Precedent of the TTAB

Oral Hearing:  May 9, 2012          Mailed:  August 9, 2012

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

In re Guitar Straps Online, LLC

_____

Serial No. 85047191

_____

Sabrina C. Stavish and Pamela N. Hirschman of the law firm Sheridan Ross PC for applicant.

Simon Teng, Trademark Examining Attorney, Law Office 105 (Thomas G. Howell, Managing Attorney).

_____

Before Grendel, Ritchie, and Lykos, Administrative Trademark Judges.

Opinion by Lykos, Administrative Trademark Judge:

On May 25, 2010, Guitar Straps Online, LLC ("applicant") filed an application pursuant to Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), to register the mark GOT STRAPS in standard character format for "bumper stickers" in International Class 16 and "online retail store services featuring straps for musical instruments and accessories for musical instruments" in International Class 35.[1]  Following publication of the mark in the *Official Gazette* and issuance of a notice of allowance, on

Serial No. 85047191

April 2, 2011, applicant filed a statement of use displaying the mark on the specimens as GOT STRAPS? with a proposed amendment to the original drawing to add the question mark.

Applicant appeals the Trademark Examining Attorney's final refusal to register applicant's mark on the Principal Register on the grounds that applicant's proposed amendment constitutes a material alteration of the original mark pursuant to Trademark Rule 2.72(b)(2) and that the mark in the drawing is not a substantially exact representation of the mark as used on the specimens under Trademark Rule 2.51(b). For the reasons explained below, we affirm both refusals to register.

First, we will discuss the examining attorney's refusal to register on the ground that applicant's proposed amendment to add a question mark to the drawing constitutes a material alteration of the original mark. If the amendment is permitted the mark on the drawing and specimen will match and the alternative ground for refusal will be moot. Trademark Rule 2.72(b) provides as follows:

> In an application based on a bona fide intention to use a mark in commerce under section 1(b) of the Act, the applicant may amend the description or drawing of the mark only if:
>
> (1) The specimens filed with an amendment to allege use or statement of use, or substitute specimens

---

[1] Application Serial No. 85047191. The term STRAPS has been disclaimed as to International Class 35.

2

> filed under § 2.59(b), support the proposed
> amendment; and
>
> (2)   The proposed amendment does not materially alter
> the mark.  The Office will determine whether a
> proposed amendment materially alters a mark by
> comparing the proposed amendment with the
> description or drawing of the mark filed with the
> original application.

Thus, as per the language of the rule, the key to deciding this question involves a comparison of the proposed amendment with the description or drawing of the mark as originally filed.  The test for determining a material alteration has been articulated as follows:

> The modified mark must contain what is the essence of
> the original mark, and the new form must create the
> impression of being essentially the same mark.  The
> general test of whether an alteration is material is
> whether the mark would have to be republished after
> the alteration in order to fairly present the mark for
> purposes of opposition.  If one mark is sufficiently
> different from another mark as to require
> republication, it would be tantamount to a new mark
> appropriate for a new application.

*In re Hacot-Colombier,* 105 F.3d 616, 620, 41 USPQ2d 1523, 1526 (Fed. Cir. 1997), *quoting Visa Int'l Service Ass'n v. Life-Code Systems, Inc.*, 220 USPQ 740, 743-44 (TTAB 1983).  Also, as has often been stated, the addition of any element that would require a further search generally will constitute a material alteration.  *In re Pierce Foods Corp.*, 230 USPQ 307 (TTAB 1986).[2]

---

[2] Both applicant and the examining attorney in their briefs imply that republication of a mark is necessary only when a new search for conflicting marks by the examining attorney is required.  The case law, however, makes a subtle distinction between these two factors.

We emphasize, however, that the question of whether a new search would be required is merely one factor to be considered in deciding whether an amendment would materially alter a mark; it is not the "controlling" factor. *In re Who? Vision Systems, Inc.*, 57 USPQ2d 1211, 1218 (TTAB 2000). *See also In re Vienna Sausage Manufacturing Co.*, 16 USPQ2d 2044, 2047 (TTAB 1990); *In re Tetrafluor Inc.,* 17 USPQ2d 1160, 1162 (TTAB 1990). Rather, the primary question is whether the proposed amendment contains "the essence of the original mark" and whether it creates "the impression of being essentially the same mark." *In re Who? Vision Systems, Inc.*, 57 USPQ2d at 1218. In other words, "the new and old forms of the mark must create essentially the same commercial impression." *Id.*, *quoting In re Nationwide Industries Inc.,* 6 USPQ2d 1882, 1885 (TTAB 1988).

   With this in mind, we now analyze the issue before us – does the proposed addition of a question mark after the word "STRAPS" constitute a material alteration?

---

*See, e.g., In re Pierce Foods Corp*., 230 USPQ 307, 308-9 (TTAB 1986)("It seems obvious that the addition of applicant's house mark creates a mark so sufficiently different from the original mark that it would not only require republication, if the mark had already been published, but also would require a new search by the Examining Attorney for possible references."). *Compare In re Nationwide Industries, Inc*., 6 USPQ2d 1882, 1885 (TTAB 1988), *citing Florasynth Laboratories, Inc. v. Mulhens,* 122 USPQ 284 (Comm'r Pats. 1959) (amendment to drawing to add *previously registered* matter for the same goods or services as those listed in the application does not constitute a material alteration, nor does it require a new search or republication, and the amendment is therefore permissible).

Applicant contends that the essence of the original mark remains unchanged because it is "merely adding punctuation to its mark." Applicant's Brief, p. 7. Applicant argues that "the commercial impression of Applicant's mark is dependent on the literal terms 'GOT STRAPS', and the addition of punctuation to the display of the mark does not significantly alter the commercial impression." Applicant's Brief, p. 8. In support of its position, applicant relies on several Board decisions holding that the presence of punctuation marks (for example, a hyphen or exclamation point) does not significantly change the meaning or significance of a mark. *See, e.g., In re Brock Residence Inns, Inc.,* 222 USPQ 920, 922 (TTAB 1984)("The presence of the exclamation point at the end of the designation [FOR A DAY, FOR A WEEK, FOR A MONTH OR MORE!] does not alter our opinion because it serves as well to emphasize the descriptive and informational significance of the designation as to indicate any other meaning."); *In re Vanilla Gorilla, L.P.,* 80 USPQ2d 1637, 1639 (TTAB 2006), *citing In re Samuel Moore & Co.,* 195 USPQ 237, 240 (TTAB 1977) ("the addition of punctuation marks to a descriptive term would not ordinarily change the term into a non-descriptive one."); *In re S.D. Fabrics, Inc.,* 223 USPQ 54 (TTAB 1984)(presence of slash in mark does not alter its descriptive connotation). These cases, however, were all decided in the context of descriptiveness refusals. The issue

of whether a punctuation symbol affects the descriptiveness of a mark has no bearing on whether the addition or deletion of a punctuation symbol constitutes a material alteration to a mark.

More on point is the Board's decision in *Richards-Wilcox Mfg. Co.,* 181 USPQ 735, 736 (Comm'r Pats. 1974), *overruled on other grounds, In re Umax Data System, Inc.,* 40 USPQ2d 1539 (Comm'r Pats. 1996) which, as in the case before us, involved the issue of material alteration and punctuation marks. In that case, the Assistant Commissioner found that the examining attorney did not abuse his discretion in denying applicant's proposed amendment of the mark FYE[R-W]ALL to FYER-WALL as a material alteration, in part, because the addition of the brackets changed the commercial impression of the mark by no longer emphasizing the initial letters of applicant's name, "R" and "W."

We also find instructive the guidance provided in the Trademark Manual of Examining Procedure ("TMEP") Section 807.14(c) (8th ed. Oct. 2011) setting forth a list illustrating instances where either the addition or deletion of punctuation changes the commercial impression of a mark for purposes of determining whether the amendment constitutes a material alteration. This list specifically includes "the addition or deletion of a question mark, which changes a statement into a question or vice versa."

6

We find that in this instance, applicant's proposed addition of a question mark to the mark "GOT STRAPS" constitutes a material alteration because it changes the commercial impression of the original mark from a declaratory statement to an interrogative phrase.  A question mark is defined as "the punctuation mark (?) placed at the end of a sentence or phrase intended as a direct question. It is also used after a word or phrase whose appropriateness is in doubt, or after a number or date whose accuracy is in doubt."  *See* online dictionary definition from Encarta® World English Dictionary attached to June 2, 2011 Final Office action.  The placement of a question mark at the end of the phrase GOT STRAPS transforms not only the appearance and meaning of applicant's original mark but also the pronunciation.  In other words, applicant's proposed amendment alters "the essence of the original mark."  The reasoning offered by the examining attorney in his brief is particularly compelling:

> …**GOT STRAPS** in this context has the overall commercial impression of a definitive statement that the speaker is in possession of guitar straps.  In short, the overall commercial impression is "I have guitar straps."  "Got" is "used for saying 'have' in informal speech." *See* online dictionary definition from MacMillan Dictionary attached to December 7, 2011 request for reconsideration denial final Office action at page 78.  Nothing from the plain meaning of the word "got" implicitly or explicitly states that a question is created when this word is used.

However, **GOT STRAPS?** has the overall commercial impression that the speaker is asking the listener whether he or she has guitar straps. The overall commercial impression is "do you have guitar straps?"…

If the mark on the drawing was **DO YOU HAVE GUITAR STRAPS**, and the mark on the specimen was **DO YOU HAVE GUITAR STRAPS?**, the addition of the question mark would not constitute a material alteration. In this hypothetical, the mark is undoubtedly a question. Therefore, the mere addition of the question mark does not change the overall commercial impression of the mark. Put in another way, the addition of the question mark simply "corrects" the punctuation of the slogan….

In summary, **GOT STRAPS?** versus **GOT STRAPS** is the equivalent to "do you have guitar straps" versus "I have guitar straps."

Applicant argues that due to the popularity of the "Got Milk?" advertising campaign, consumers recognize 'Got ____' marks to be a parody of the 'Got Milk?' campaign and automatically perceive the mark as a question, even if no question mark is included. Applicant's Brief, p. 11. In support thereof, applicant introduced in the record an excerpt from Wikipedia® and one online article describing the "Got Milk?" advertising campaign and its success. While both articles indicate that parodies of the "Got Milk?" advertising campaign are popular, none of the articles discuss the issue of whether consumers encountering "Got ____" slogans without a question mark perceive the mark as a declaratory statement or as

Serial No. 85047191

a question. The evidence therefore fails to support applicant's argument.[3]

Applicant also contends that neither republication of the mark nor a new search for conflicting marks would be required by the proposed amendment, and therefore there is no material alteration. Applicant relies on the fact that numerous third-party applications and registrations comprised of the phrase "GOT ____?" do not include a design code for the question mark for searching the USPTO database. Based on the lack of the design code to designate the question mark, applicant maintains that "the U.S. Patent and Trademark Office does not believe that the question mark is a significant feature of the mark, and that it is not necessary to include the question mark in a search for the mark." Applicant's Brief, p. 7.

Applicant's reliance on the Office's design coding practice is misplaced. As noted above, applicant applied to register its mark in standard character format. According to Guideline 1 of the *U.S. Design Search Code Manual* (available at www.uspto.gov), "TRADEMARKS COMPOSED MERELY OF STANDARD CHARACTERS, TYPE PRINT, BLOCK OR STYLIZED LETTERING ARE NOT CODED BECAUSE THEY DO NOT

---

[3] We make no comment as to whether registration of applicant's mark would be precluded by Section 43(c) of the Trademark Act, 15 U.S.C. § 1125(c) which involves dilution. Although dilution is a ground that the Board may consider in the context of an inter partes proceeding, the Trademark Amendments Act of 1999, Pub. L. 106-43, 113 Stat. 218, amended Section 2 of the Trademark Act to make clear that it is not a

CONTAIN DESIGN ELEMENTS." Thus, question marks in marks in standard character form are not treated as design marks, and that is the reason the Office does *not* assign a design code to them. In any event, whether or not a term has been assigned a design code is purely an administrative practice and has no bearing on our determination of the issue of material alteration.

While we do agree with applicant that a new search for conflicting marks would not be required, nonetheless, whether a new search is or is not required is not the controlling factor in our analysis – it is merely one factor for our consideration. See discussion in footnote 2, *supra*. More important is the question of whether republication of the mark would be required if the mark had already been published, and, given the change in the commercial impression of the mark, republication would be necessary in order to give interested third parties adequate notice. When the material alteration standard of Trademark Rule 2.72 was amended effective October 30, 1999, the Notice of Final Rulemaking, published at 64 Fed. Reg. 48900 provided the following reasoning for the amendment:

> Because the granting of a filing date to an application potentially establishes a date of constructive use of the mark under Section 7(c) of the Act, timely and accurate public notification of the

ground for ex parte refusal by examining attorneys during the examination phase.

> filing of applications is important. Accepting an amendment that materially alters the mark on the original drawing is unfair to third parties who search Office records between the application filing date and the date of the amendment, because they do not have accurate information about earlier-filed applications. Relying on the search of Office records, a third party may innocently begin using a mark that conflicts with the amended mark, but not with the original mark. Also, an examining attorney may approve a later-filed application for registration of a mark that conflicts with the amended mark, but not with the original mark….

In view of the foregoing, we find applicant's proposed amendment to add a question mark at the end of the phrase GOT STRAPS is a material alteration within the meaning of Trademark Rule 2.72.

Applicant asserts that in the event the Board determines that an amendment to the drawing is impermissible, in the alternative it is entitled to register the mark GOT STRAPS without the question mark symbol using the current specimens of record. This brings us to the issue of whether the mark in the drawing GOT STRAPS is a substantially exact representation of the mark as used on the specimens. The specimens for International Classes 16 and 35 submitted with applicant's statement of use display the mark as follows:



Serial No.  85047191



Welcome to

Welcome to Guitar Straps Online. This is the place to buy that special guitar strap. The one that is exactly what you want, the way you want it. A guitar strap should be as unique as the person using it. Here at Guitar Straps Online we are committed to helping you get exactly what your want at a price that is right for you. Most custom guitar straps come at a mighty high price which is great if you're Santana and already playing to sold out arenas. But most of us want that cool guitar strap while we are still shooting for the stars. Just because your band, or you as a solo artist, aren't in the market for a $500 strap doesn't mean you can't have a custom made guitar strap. Our guitar straps are handmade right here in the good 'ol US of A. We are actually right here in the Colorado Rocky Mountains. Our experienced craftspeople use high quality materials and innovative designs to get that strap to look just right.

Guitar Straps Online can use your original artwork, your band name, logo, material from a favorite pair of jeans that no longer covers your ass or grandpa's favorite flannel shirt that still smells of high quality pipe tobacco. If you can dream it, we can make it. One of our specialties is the Breast Cancer Pink Ribbon embroidered along with the name of your loved one.

One of the things that sets apart is we offer a lifetime guarantee, no questions asked. If there is ever a problem with your guitar strap we will replace it. If you are not happy with your guitar strap when it arrives we will work with you to make it right or we will give you your money back. In addition to making this promise to our customers we offer many more options than the competition. We can custom make your guitar strap to your specifications. You decide if you want your strap longer, shorter or adjustable. We also offer our basic nylon guitar strap with a pattern of your choosing all the way up to completely custom leather made anyway you like.

Check out our customer testimonials section. As you will see, we have worked with many of our customers to make guitar straps and accessories fit their specific needs. Also, you can see that we have many satisfied customers, from your neighbor next door to many internationally recognized guitar players.

Shop Guitar Straps Online. If you are not already a rock star, we will treat you like one anyway. Besides, rock stars don't pay for anything!

"Visit Our Best of the Web Page"

Privacy Statement     We love the people at     NotJustWebsites.com     who created our site     Disclaimer

**Guitar Straps Online**

The examining attorney argues that the mark as it appears on the drawing is not a substantially exact representation of the mark as used on the specimens because the addition of the question mark to the specimen alters the overall commercial impression of the mark.  The examining attorney therefore maintains that substitute specimens are required.  Applicant, relying on the case of *In re Raychem Corp.*, 12 USPQ2d 1399 (TTAB 1989), and excerpts from the TMEP, argues that the phrase GOT STRAPS is created by the literal elements of the words, as opposed to the punctuation shown in the specimen, and thereby the wording GOT STRAPS creates a separate and distinct commercial impression from the question mark shown next to these words in the specimen.

The "drawing depicts the mark sought to be registered." Trademark Rule 2.52, 37 CFR § 2.52.  "In an application under section 1(b) of the Act, the drawing of the mark must be a substantially exact representation of the mark as intended to be used on or in connection with the goods and/or services specified in the application, and once an amendment to allege use under § 2.76 or a statement of use under § 2.88 has been filed, the drawing of the mark must be a substantially exact representation of the mark as used on or in connection with the goods and/or services."  Trademark Rule 2.51(b), 37 CFR § 2.51(b).  "An applicant may seek to register any portion of a

composite mark if that portion presents a separate and distinct commercial impression."  *In re Lorillard Licensing Co.*, 99 USPQ2d 1312 (TTAB 2011), *citing In re 1175854 Ontario Ltd.*, 81 USPQ2d 1446 (TTAB 2006).  In other words, "the mark as actually used must not be so entwined (physically or conceptually) with other material that it is not separable from it in the mind of the consumer."  *In re Yale Sportswear Corp.*, 88 USPQ2d 1121 (TTAB 2008), *quoting In re Chem. Dynamics Inc.*, 839 F.2d 1569, 5 USPQ2d 1828, 1830 (Fed. Cir. 1988).

The TMEP provides the following guidance in assessing differences in punctuation between the mark on the drawing and the mark on the specimens:

### 807.12(a)(i) Role of Punctuation in Determining Whether Mark on Drawing Agrees with Mark on Specimen

In assessing discrepancies in punctuation between the mark on the drawing and the mark shown on the specimen, the general rule is that:

(1) Extraneous, non-distinctive punctuation that appears on the specimen may be omitted from the mark on the drawing, because an acceptable specimen may contain additional matter used with the mark on the drawing, so long as the mark on the drawing makes a separate and distinct commercial impression apart from the other matter. *See* TMEP §807.12(d) and cases cited therein regarding "mutilation" of the mark.

(2) Punctuation in the mark on the drawing must also appear on the specimen because a mark sought to be registered under § 1 must be "used in commerce," and if the punctuation on the drawing does not appear on the specimen, the mark on the drawing is not used in commerce.

**807.12(a)(iii) Punctuation on the Specimen but Not on the Drawing**

Generally, extraneous, non-distinctive punctuation marks that appear on the specimen may be omitted from the drawing, if the matter on the drawing makes an impression separate and apart from the punctuation marks that appear on the specimen. *See* TMEP § 807.12(d).  For example, if the mark on the drawing is HOME RUN, and the mark on the specimen is "HOME RUN," the drawing is considered a substantially exact representation of the mark as used on the specimen.  The quotation marks on the specimen are nondistinctive and do not change the commercial impression of the mark, so it is unnecessary to amend the drawing or require a substitute specimen.

However, in rare instances, the punctuation marks on the specimen result in a mark with a different commercial impression than the mark shown on the drawing.  For example, if the mark on the specimen is PREGNANT?, and the mark on the drawing is PREGNANT, the mark on the drawing is not a substantially exact representation of the mark as actually used.  The question mark on the specimen transforms the word PREGNANT from a mere statement to a question, and, therefore, changes the commercial impression of the mark.  Moreover, the drawing cannot be amended to add the punctuation because it would result in a material alteration.  Therefore, the applicant must submit a new specimen showing the mark without the punctuation. *See* TMEP §§ 807.14 *et seq*.

Although we are not bound by hypotheticals discussed in the TMEP, in this particular case, we do find the hypothetical involving the question mark persuasive.

In addition, the facts presented in *In re Raychem*, *supra*, are distinguishable from the facts presented here.  In that case, the Board reversed the examining attorney's refusal to register the mark "TINEL-LOCK" on the grounds that the mark as

shown on the drawing did not agree with the display of the mark on the specimens as "TRO6A1-TINEL-LOCK-RING." The evidence in the record showed that the alpha-numeric designation "TRO6A1" was a stock number, and that the term "RING" was a generic designation for the goods. As the Board explained:

> In the case at hand the alpha-numeric designation appearing on the specimen in front of "TINEL-LOCK" is not essential to the commercial impression of "TINEL-LOCK" as a trademark for applicant's metal rings. In a similar sense, the generic term "RING," although connected to the model number and the source-identifying term, "TINEL-LOCK," by a hyphen, nonetheless plays no integral role in forming the portion of applicant's mark which distinguishes applicant's goods from those of others. Applicant therefore need not include either the part number or the generic term in the drawing, because neither is essential to the commercial impression created by the mark as shown in the specimens. Prospective purchasers of these highly technical goods would readily recognize both the part number and the name of the goods as such, and would therefore look only to the trademark "TINEL-LOCK" for source identification. The fact that hyphens connect both the part number and the generic term to the mark does not, under the circumstances presented by this case, create a unitary expression such that "TINEL-LOCK" has no significance by itself as a trademark. Such independent significance is in fact supported by applicant's use of the mark without the part number or generic designation in its advertising materials.

*In re Raychem*, 12 USPQ2d at 1400. In the case before us, the specimens do not display the mark as used with a model or stock number or a generic indicator. Instead, we find the Board's determination in the case of *In re Yale Sportswear Corp*., 88 USPQ2d 1121 (TTAB 2008), as presenting a more apt analogy.

17

There, the Board affirmed the examining attorney's refusal to register the mark "UPPER 90" on the grounds that applicant's drawing was not a substantially exact representation of the mark as used, where the mark depicted on the specimens appeared as "UPPER 90°" with the addition of a degree symbol.  As the Board reasoned:

> Although the degree symbol in applicant's mark is not physically large, we find that it nonetheless substantially changes the overall impression of the mark.  Without the degree symbol, it is unclear what the "90" in the drawing might refer to.  However, when viewed on applicant's specimens of use, the degree symbol in the mark would clearly be perceived as modifying the preceding number, making clear that its meaning is "ninety degrees," indicating that it refers to either an angle or a temperature.  As such, the mark might possibly suggest to the potential purchaser that applicant's sports clothing is made for playing in especially hot weather, or indeed that the mark refers to an angle, as applicant contends.

> Thus, the mark in the specimen has a different connotation, would be pronounced differently ("upper ninety" vs. "upper ninety degrees,") and looks slightly different than the mark sought to be registered.  The degree symbol in this case clearly adds to the meaning of the mark in the application. Our conclusion is therefore that UPPER 90 does not form a "separate and distinct" commercial impression. It cannot be severed from the degree symbol without altering the meaning, pronunciation, and, to some extent, the appearance of the mark.

*Id*. at 1123-4.

Similarly here the addition of the question mark not only "adds to the meaning" of the phrase "GOT STRAPS" but indeed transforms the significance of the phrase from a declaratory

statement to a direct question. See discussion *supra*. The literal element of "GOT STRAPS" cannot be "severed" from the question mark without altering the commercial impression or meaning of the mark. Prospective consumers will not only perceive the mark differently but will also pronounce the mark differently as well. Such an alteration changes the commercial impression of the mark. As such, the question mark at the end of the phrase "GOT STRAPS" is "entwined" as an integral part of the mark as used in commerce. We therefore find that applicant's drawing of the mark is not a substantially exact representation of the mark as used in commerce. *See* Trademark Rule 2.51(b).

DECISION: Both refusals to register are affirmed.